Curtin, J.
Plaintiff National Lumber Company (“National”) commenced this action to enforce a “mechanic’s” lien pursuant to G.L.c. 254, §4 on lands and buildings owned by defendants Lawrence and Elizabeth Epstein (the “Epsteins”). After trial, judgment was entered for National on both its complaint and the Epsteins’ counterclaims.[2] The Epsteins have appealed pursuant to Dist/Mun. Cts. RAD.A, Rule 8C.
The salient facts are not in dispute. In June of 1994, the Epsteins purchased a parcel of land (Lot 15D) at 397 Woodward Street, Newton, Massachusetts from Mario DiBona (“DiBona”), Trustee of S & M Realty Trust. As part of their purchase, the Epsteins agreed to hire DiBona to construct a house on the lot. DiBona, a contractor, was at the time building his own home upon an adjacent lot located at 425 Woodward Street, and was also renovating an existing dwelling at 401 Woodward Street. To develop the three properties on Woodward Street, DiBona had set up a corporation entitled M.N.D. Development Corp. in which he was the president, treasurer and sole stockholder. DiBona had also intended to form a corporation called M.N.D. Construction, Inc., but never did so. There was evidence, however, that DiBona did business as M.N.D. Construction, Inc.
DiBona had done business with plaintiff National Lumber Company (“National”) in the 1970’s, and approached National about supplying the lumber and other building materials needed for the construction work at the Woodward Street properties. On September 2,1994, DiBona completed a credit application at National on behalf of M.N.D. Development Corp. and signed the application as M.N.D.’s president. DiBona also signed an unconditional personal guarantee of M.N.D.’s obligations to National.[3] On September 17,1994, the Epsteins and DiBona executed a written construction agreement in accordance with plans provided by the Epsteins.
On November 29,1994, National entered into a written Sales Agreements with “M.N.D. Const. Inc.” for the construction materials to be utilized on the Epstein house at 397 Woodward Street. The construction completion date was designated as May 30,1995. Attached to the Sales Agreement were lists and price estimates of all needed materials. These estimates indicated that “M.N.D. Const. Inc.” was to be billed for the materials.
National thereafter made deliveries of materials to the Epstein property from *318 December, 1994 to March, 1995. The goods were ordered by DiBona, and invoiced to M.N.D. Development Corp. DiBona, as general contractor, commenced work on the Epstein residence, and the Epsteins’ construction mortgagee, Mercantile Bank & Trust Co. (“Mercantile”), periodically disbursed funds to DiBona as work progressed. DiBona did not, however, make any payments to National for the materials used.
On January 4, 1995, National recorded a G.L.c. 254, §4 Notice of Contract against the Epstein property. The Notice recited, in pertinent part, that the contract upon which it was predicated was “a written contract dated November 29, 1994 by and between M.N.D. Development Corp. of Millis, MA, customer and National....” The Notice correctly identified both the property in question and the Epsteins as owners. It was also undisputed that the Epsteins received a copy of National’s Notice of Contract. However, the Epsteins not only took no action and made no inquiries in response to the Notice, but also continued for months to make payments to DiBona.
By the spring of 1995, the Epsteins had become dissatisfied with DiBona’s work, and their construction lender, Mercantile, refused to approve additional payments until DiBona was terminated from the job. The Epsteins paid DiBona more than $100,000.00 between September, 1994 and May, 1995. National supplied $42,927.77 in materials, but never received any payment from either DiBona or the Epsteins.
On June 20,1995, National recorded a G.L.c. 254, §8 Sworn Statement of Claim to perfect its lien. The Statement references the November 29, 1994 written contract between National and M.N.D. Development Corp. In July, 1995, National commenced suit against the Epsteins, DiBona and M.N.D. Development, Inc. (Newton Division #9512-CV-384). In August, 1995, the Epsteins obtained a bond from Aetna Casualty & Surety Co. (“Aetna”) to discharge National’s lien. On September 25, 1995, National filed this action against the Epsteins and Aetna to recover on the bond. The two actions were consolidated for trial upon the Epsteins’ motion. On October 7, 1998, DiBona filed a Suggestion of Bankruptcy. Both the claims against DiBona and, inexplicably, against M.N.D. Development, Inc. as well, were stayed. The consolidated actions proceeded to trial on the claims and counterclaims between National, the Epsteins and Aetna. Following the entry of judgment for National, this appeal was filed.
1. General Laws Chapter 254 sets forth a comprehensive legislative scheme for the creation, perfection and enforcement of a mechanic’s lien to secure a debt owed to one who, with the consent or agreement of the owner, has furnished labor or materials for the improvement of real estate. G.L.c. 254, §1. See Hammill-McCormick Assocs., Inc. v. New England Tel. & Tel. Co., 399 Mass. 541, 542 (1987). Because a mechanic’s lien “is solely a statutory creation... [it] can only be enforced by strict compliance with the statutory specifications.” East Coast Steel Erectors, Inc. v. Ciolfi, 417 Mass. 602, 605 (1994). See also National Lumber Co. v. LeFrancois Const. Corp., 430 Mass. 663, 666 (2000); Mullen Lumber Co. v. Lore, 404 Mass. 750, 752 (1989). Section 4 of G.L.c. 254, in effect in 1994,[4] provided as follows:
Whoever, subsequent to the date of the original contract, furnishes labor or material, or both labor and material, or performs labor, under a written contract with a contractor, or with a subcontractor of such contractor, may file in the Registry of Deeds for the county or district where such land lies a notice of his contract....
National’s initial burden under the statute was to establish the existence of a written contract between it and the contractor or subcontractor to which it supplied *319 the building materials. Gettens Elec. Supply Co. v. W.R.C. Properties, Inc., 21 Mass. App. Ct. 658, 660-661 (1986).
National stated in both its G.L.c. 254, §4 Notice of Contract and its §8 Sworn Statement of Claim that its written contract was a November 29, 1994 agreement with M.N.D. Development Corp. of Millis, Massachusetts to supply materials for the Epstein project. At trial and again at oral argument before this Division, National asserted that the written contract of November 29,1994 is evidenced by two exhibits entitled “Sales Agreement” with attached lists and estimates for all materials required to complete the Epsteins’ house. We note that the Sales Agreement, which was drafted by National, clearly states that the customer was “M.N.D. Const., Inc.” The attached material lists and estimates identify “M.N.D. Const. Inc.,” with a Newton address, as the billing entity. Indeed, neither the Sales Agreement, nor the attached estimates, make any reference to M.N.D. Development Corp. of Millis. The trial judge nevertheless found that National had proved a November 23,1994 written contract with M.N.D. Development, the materials subcontractor, to furnish the construction materials for the Epsteins’ house, and had properly identified that contract in its G.L.c. 254, §4 Notice of Contract.[5] Of greater significance for purposes of our review is the fact that the Epsteins have not contested the court’s conclusion on this appeal. By failing to address this issue in their brief, the Epsteins have effectively waived appellate consideration of it. See generally Continental Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 145 nn.3 & 4 (1984); Kellerman v. Kellerman, 390 Mass. 1007, 1008 (1984); St. Mary’s Credit Union v. Mavretic, 1999 Mass. App. Div. 159, 160.
The Epsteins instead argue on this appeal that National failed to satisfy the written contract requirement of G.L.C. 254, §4 because it offered no evidence of an additional written contract; namely, one between the contractor (DiBona) and the materials subcontractor (M.N.D. Development). The short answer to the Epsteins’ contention is that the statute is devoid of any requirement that the lien holder or supplier establish a written contract between the contractor and subcontractor in order to enforce its mechanic’s lien. The statute refers to only two contracts. These are the “original contract” between the owner (Epsteins) and general contractor (DiBona), the existence of which is undisputed in this case; and the “written contract” between the material supplier (National) and contractor or subcontractor (M.N.D. Development), the existence *320 of which the Epsteins have not challenged on this appeal. No third written contract is statutorily listed or mandated. We may not construe G.L.c. 254, §4 to add a requirement that the Legislature chose not to include. See Commissioner of Revenue v. Cargill, Inc., 429 Mass. 79, 82 (1999); Dartt v. Browning-Ferris Indus., Inc., 427 Mass. 1, 8 (1998); Case of Benson, 47 Mass. App. Ct. 756, 758 (1999).[6]
2. The Epsteins’ sole remaining challenge to the enforcement of National’s lien is their contention that this action should have been automatically dismissed for National’s failure to join the Epsteins’ construction lenders as parties in interest. The Epsteins rely on the following portion of G.L.c. 254, §5:
The plaintiff shall bring his action in his own behalf and in behalf of all other persons in interest who shall become parties.... All other parties in interest may appear and have their rights determined in such action, and at any time before entry of final judgment, upon the suggestion of any party in interest that any other person is or may be interested in the action, or of its own motion, the court may summon such person to appear in such cause on or before a day certain or be forever barred from any rights thereunder. The court may in its discretion provide for notice to absent parties in interest. The terms ‘party in interesti and ‘person in interest,’ as used in this chapter, shall include mortgages [sic] and attaching creditors.
Contrary to the Epsteins’ contention, there is nothing in the plain language of this statute that mandates the dismissal of an action for failure to join a mortgagee. Had the Epsteins truly deemed Mercantile and their subsequent construction lender, Andover Bank (“Andover”), to be necessary parties, they could have moved at any time prior to the entry of judgment for their addition. Similarly, the court could have required the mortgagees to appear. The record suggests, however, that there was little need. Mercantile discharged the Epsteins’ mortgage on February 12, 1996, more than three years before trial, and could not be considered a party in interest after that date. Conversely, Andover did not become a mortgagee of the properly until November, 1995, months after National had commenced these actions. As the Epsteins’ mortgage to Andover was recorded on November 21, 1995, long after National had recorded both its Notice of Contract and Sworn Statement of Claim, Andover granted a mortgage loan to the Epsteins with full knowledge of National’s claim. Andover never sought to intervene in these proceedings.
The trial court’s judgment for plaintiff National Lumber Company is affirmed. The defendants’ appeal is dismissed.
So ordered.

 The Epsteins have not raised any issue on this appeal relative to their counterclaims.

 National requested and received additional security from DiBona. DiBona executed a $50,000.00 note in favor of National and granted mortgages on both his home and 401 Woodward Street. The mortgages were discharged in January, 1995.

 The lien statute was substantially revised in 1996. None of the amendments, however, is applicable herein.

 The trial judge found, inter alia, that the Sales “Agreement states that the goods will be shipped directly to the Epstein residence at 397 Woodward and would be billed to ‘MND Construction Inc.’ The evidence at trial was that this was not a separate corporate entity but may have been a name which DiBona used to conduct business. The business address of MND Construction was the same address used by MND Development, and by DiBona in his contract with the Epsteins. (As DiBona himself testified at trial, whether the entity was MND Development or MND Construction, ‘it was all me’). The materials were bought on a line of credit which DiBona obtained on behalf of MND Development just two months before, with DiBona as individual guarantor. ... All invoices and delivery slips for these materials were sent to MND Development. ... Based on the testimony at trial and construing all documents together, I find the Agreement was between National Lumber and MND Development, with DiBona as its president. ... The Notice of Contract references the Agreement between National Lumber and MND Development dated November 29,1994, whereby plaintiff agreed to furnish materials for a dwelling on Lot 15D on Woodward Street. Although the Notice of Contract does not name DiBona individually, the Property is clearly described, the owners are identified as the Epsteins and the date of the completion for the contract is stated to be May 30,1995. On or before the recording of this Notice of Contract, it was sent to the Epsteins, who acknowledged receiving it.”

 Moreover, to the extent that the real basis of the Epsteins’ argument is some doubt that M.N.D. Development served as the materials subcontractor herein, the trial evidence did not require a contrary finding. See note 4, supra. Nor is there any merit to the Epsteins’ argument that it is necessary to disregard M.N.D. Development’s corporate status in order to recognize its role as the materials subcontractor and its relationship to DiBona. While a corporation is a separate and distinct legal entity, it can only act through its agents and officers. Sunrise Properties, Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, 425 Mass. 63, 66 (1997); Sarvis v. Boston Safe Deposit & Tr. Co., 47 Mass. App. Ct. 86, 96 (1999). As M.N.D. Development’s sole officer and shareholder, DiBona controlled the corporation and utilized it to obtain a line of credit with National and to purchase the materials necessary for the project for which DiBona served as general contractor.