# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 19, 2013

No. 12-30406

Lyle W. Cayce
Clerk

AMY AVERY SAMPSON, Individually and on behalf of KAS and TLS,

Plaintiff – Appellant

v.

GATX CORPORATION; CLIFTON KIRBY; HONEYWELL
INTERNATIONAL INCORPORATED,

Defendants – Appellees

Appeals from the United States District Court
for the Western District of Louisiana
USDC No. 5:10-CV-1834

Before JOLLY, PRADO, and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

Amy Avery Sampson, widow of Shannon Sampson, sued GATX
Corporation, GATX employee Clifton Kirby, and Honeywell International
Incorporated, alleging defendants' negligence caused her husband's death inside
the tank of a railcar he had entered to inspect and photograph as part of his
employment. The magistrate judge issued memorandum rulings recommending
the grant of summary judgment on behalf of all defendants. Based on that

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 12-30406

recommendation, the district court dismissed all claims.  We AFFIRM the judgment of dismissal as to defendants GATX and Clifton Kirby.  With respect to Honeywell, however, we hold that genuine issues of material fact exist as to whether Honeywell breached its duty to Shannon Sampson, a deceased employee of GATX, and, if so, whether the breach caused his death.  We therefore REVERSE the district court's grant of summary judgment in Honeywell's favor, and REMAND the case for further proceedings not inconsistent with this opinion.

I.

General American Transportation Corporation ("GATX") leases, operates, and manages railcars, as well as marine vessels and other equipment.  GATX is a leader in the railcar leasing industry and controls one of the largest privately owned railcar fleets in the world, with approximately 132,000 railcars in North America and Europe.  One of GATX's customers is Honeywell International, Inc. ("Honeywell"), a major American company that makes household and industrial products, including a refrigerant gas known as Genetron 22 ("G-22").  As part of its business, Honeywell leased GATX tank railcars to transport G-22.

In connection with this relationship, on May 10, 1982, GATX and Honeywell entered into a "car service contract" (the "Agreement"), which provides:

> [W]ith respect to any car, [Honeywell] shall return such car to GATX in the same condition complete with all parts, equipment and accessories as when initially delivered to [Honeywell], ordinary wear and tear excepted, *and cleaned of commodities*; but nothing herein shall be construed as relieving GATX from its obligation to maintain the cars as provided [elsewhere in the Agreement].

(emphasis added).  The Agreement defines "cleaned of commodities" to mean:

> [C]leaned of all commodities and accumulations and deposits caused by commodities to the effect that there is no measurable amount of

2

No. 12-30406

such commodities, accumulations and deposits remaining in the car *and the car is safe for human entry*.

(emphasis added). The Agreement does, however, contemplate the situation where the customer returns a railcar to GATX without cleaning it to the agreed-upon standards, providing that: "Notwithstanding the foregoing [requirements], Customer shall pay service charges . . . for any returned car if Customer has not caused the car to be cleaned of commodities."

The Agreement also provides that GATX may provide cleaning services pursuant to a separate "car cleaning contract" attached to the Agreement. The car cleaning contract provides that "upon the forwarding or movement by Customer of any car to a GATX facility," the customer "shall represent to GATX" one of the following three things, depending on the condition of the car: that the car never carried hazardous waste; the nature and amount of hazardous material contained in the car; or "that the car has been cleaned of commodities (as defined in the Car Service Contract)." Thus, on the one hand, the Agreement requires Honeywell to return the car cleaned and "safe for human entry;" if it fails to do so, however, it states that Honeywell will be charged.

The tank railcar that is the subject of this case was marked as GATX 25031. Honeywell had leased the car and cleaned it on February 21, 2010 before returning it to GATX. Honeywell employees described the cleaning procedures used, testifying that after removing the remaining refrigerant, there would still be residual organic material from the G-22 inside the car's atmosphere. To eliminate that organic material, Honeywell used a "nitrogen pad" to displace the organic material inside the car.[1] The nitrogen pad would be used until a test

---

[1] The purpose of a nitrogen pad is to remove the organic material from the chamber of a rail car, thus cleaning the car for further use. Normally, once a pad absorbs the organic material, the car is "vented" in order to expel the nitrogen from the railcar. Once the car is vented, a "four-gas crowcon,"which indicates the oxygen level inside the car, is used to tell if the car has nitrogen remaining.

showed that the residual material in the car was at a safe level, meaning less than 1,000 parts per million.

The report on GATX 25031 indicates that Honeywell employees swept the car with nitrogen and received an acceptable result. This result, however, does not imply that there was no nitrogen remaining. Honeywell then issued a cleaning certificate for the railcar stating that the car had been "internally cleaned" on February 21, 2010, but the certificate did not specify that nitrogen had been used, nor did it indicate that the railcar contained safe levels of oxygen.

Shannon Sampson worked as a Senior Service Field Specialist for GATX in Minden, Louisiana and had received annual training on the safety protocols for inspecting railcars. GATX had an OSHA-mandated Confined Space Program in place that prohibited employees from entering a railcar without first sampling the oxygen level.[2]

On March 12, 2010, Shannon Sampson and other GATX employees, including his brother-in-law Jason Avery, were assigned to inspect and photograph railcars at GATX's Minden facility. Shannon Sampson was in charge of the inspections, and his job required him to enter the tank cars and take pictures. Both Avery and another employee, Trant Jackson, were wearing safety harnesses, but Shannon Sampson was not. Normal safety procedures required the employee who entered the cars to be attached to a safety extraction device, but on the day in question, one of the two extraction devices at the facility was being used elsewhere and the other one was out of service.

With tragic results, Shannon Sampson did not test the interior of GATX 25031 before he entered (which Avery testified was unusual) because he was in

---

[2] One part of the Confined Space Program stated, in relevant part, that employees should "NEVER TRUST [THEI]R SENSES TO DETERMINE IF THE AIR IN A CONFINED SPACE IS SAFE!," warning that employees "CAN **NOT** SEE OR SMELL MANY TOXIC GASES AND VAPORS, NOR [] DETERMINE THE LEVEL OF OXYGEN PRESENT."

"too big of a hurry." In its statement of uncontested facts, Honeywell acknowledged that "the environment inside GATX 25031 was incapable of supporting human life" and that, when Shannon Sampson entered, he was "overcome by the hazardous environment" and was rendered unable to exit the car, ultimately dying of asphyxiation. Avery testified that Sampson had begun to climb back up the ladder to exit the car when he was overcome by the environment inside the car, let go of the ladder, and hit his head on the side of the car. Avery clarified that if the safety mechanism had been attached to Shannon Sampson, the other two members of the team would have been able to pull him out of the car once he fell off the ladder.

Amy Avery Sampson, Shannon Sampson's widow and the appellant here, sued GATX, GATX employee Clifton Kirby (Shannon Sampson's supervisor), and Honeywell on behalf of herself and her two minor children.[3] All defendants moved for summary judgment.[4] The magistrate judge issued a memorandum ruling recommending granting summary judgment for GATX and Clifton Kirby;[5] the district court accepted the recommendation and dismissed all claims against those defendants, holding that the Federal Employers' Liability Act (FELA), 45

---

[3] Sampson also named GATC Corporation and the Kansas City Southern Railway Company, which transported GATX 25031, as defendants. The district court granted summary judgment dismissing GATC Corporation and Kansas City Southern Railway Company, and Sampson does not appeal these dismissals.

[4] The case was brought in federal court because three of the original five defendants removed the case, properly alleging that they were diverse in citizenship from Sampson, the Louisiana plaintiff. *See* 28 U.S.C. § 1332(a)(1), § 1332(c), § 1441(a).

[5] Although Sampson filed a notice of appeal from the district court's grant of summary judgment for GATX and Kirby, she does not assert any arguments regarding Kirby in her brief on appeal. Therefore, she has waived her claims against Kirby. *Matter of Texas Mortg. Servs. Corp.*, 761 F.2d 1068, 1073 (5th Cir. 1985) ("Issues not raised or argued in the brief of the appellant may be considered waived and thus will not be noticed or entertained by the court of appeals") (internal quotation marks omitted); FED. R. APP. P. 28(a)(9)(A) ("The appellant's brief must contain . . . [the] appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."). She argues only that the district court erred in finding that GATX is not covered by the FELA.

No. 12-30406

U.S.C. § 51, *et seq.*, did not cover Sampson's claims against GATX and that the Louisiana Workers Compensation Act ("LWCA"), LA. REV. STAT. ANN. § 23:1031, *et seq.*, was Sampson's exclusive remedy against GATX.[6]  Sampson timely appealed.   The magistrate judge issued a separate memorandum ruling recommending granting summary judgment for Honeywell; the district court accepted the recommendation and dismissed all claims against it.  On appeal, Sampson argues that the district court erred in concluding that Honeywell had no contractual duty to Shannon Sampson.[7]

On this appeal, there are thus two issues: first, whether the court erred in granting summary judgment on behalf of GATX and, second, whether it erred in granting summary judgment to Honeywell.

## II.

Before we reach the merit issues, however, we need to resolve the matter of our jurisdiction.  Ordinarily, a judgment entered by a district court in favor of less than all parties in a lawsuit is not appealable until all other claims affecting all other parties are finally resolved.  FED. R. CIV. P. 54(b) (When an action involves multiple parties, "any order . . . that adjudicates . . . the rights and liabilities of fewer than all the parties does not end the action as to any of the claims of parties . . . ."); *see also* FED. R. APP. P. 4(a)(2) ("A notice of appeal filed after the court announces a decision or order – but before the entry of the judgment or order – is treated as filed on the date of and after the entry.").

---

[6] GATX does not dispute its liability to Sampson under the LWCA.  GATX had paid $56,197.33 in benefits to Sampson and her children as of September 7, 2011, and represented that it would continue to pay benefits "until an unforeseen time in the future per the terms of the" LWCA.

[7] Before the district court, Sampson also claimed what amounted to a "failure to warn" on the part of Honeywell, alleging that Honeywell's placarding was insufficient to warn of the hazardous nitrogen environment inside the car.  Because Sampson does not make any argument disputing the district court's ruling on her failure-to-warn claim, she has waived that argument. *See Matter of Texas Mortg. Servs. Corp.*, 761 F.2d at 1073; FED. R. APP. P. 28(a)(9)(A).

6

No. 12-30406

Sampson filed her notices of appeal against GATX and Honeywell at different times:

Notice against GATX / Clifton Kirby – April 17, 2012

Notice against Honeywell – April 27, 2012

The court had entered judgment on the following dates:

GATX / Clifton Kirby – March 19, 2012

Honeywell – March 29, 2012

Kansas City Southern – April 18, 2012

Thus, because Sampson filed the notice against GATX on April 17, 2012, one day *before* the district court ruled on the final motion for summary judgment by one of GATX's co-defendants, Kansas City Southern Railway – but *after* the court had granted summary judgment motions on behalf of GATX and Honeywell – there is some question as to whether her appeal to this court was premature.

Review of our precedents, however, indicates that we have jurisdiction. *Young v. Equifax Credit Information Services* presented a situation in which the appellant filed its notice of appeal of a summary judgment grant to one of the defendants; we noted that "the district court's order was not a final judgment because it neither disposed of the claims against all the defendants nor was it certified as a final judgment pursuant to Fed. R. Civ. P. 54(b)." 294 F.3d 631, 634 n.2 (5th Cir. 2002). This court nonetheless concluded that it had jurisdiction over the appeal, because "the order would have been appealable if the district court had certified it pursuant to Rule 54(b) and because the district court did subsequently (and prior to oral argument herein) dispose of all remaining parties and claims." *Id.* (citing *Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 379 (5th Cir. 1996)).

GATX concedes that under the precedent of *Young*, the court has jurisdiction over Sampson's appeal of the summary judgment grant to GATX even though the notice of appeal was technically premature. As in *Young*, the

order here could have been certified as final under Rule 54(b), and, as in *Young*, the district court subsequently disposed of the claims against the only remaining defendant (Kansas City Southern Railway) – one day after Sampson filed her notice of appeal as to GATX. Under relevant precedent, we have jurisdiction over the appeal.

### III.

In reviewing a grant of summary judgment, this court applies the same standard as the district court. *F.D.I.C. v. Ernst & Young*, 967 F.2d 166, 169 (5th Cir. 1992). This court reviews questions of law *de novo* and reviews the record in the light most favorable to the non-movant. *Id.* Summary judgment is proper where "after adequate time for discovery . . . [the non-movant] . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* Summary judgment is appropriate if there is no genuine dispute as to any material fact in the case and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

### IV.

First, we consider whether the district court erred in granting summary judgment on behalf of GATX. Before the district court, Sampson made two arguments regarding why workers' compensation under the LWCA was not her only remedy against GATX: first, GATX (through its employee Clifton Kirby) had committed an intentional tort, and second, GATX was subject to claims under the FELA. The district court found that Sampson did not oppose summary judgment on whether Kirby's actions rose to the level of an intentional tort and therefore granted summary judgment in favor of GATX and Kirby on that issue. As discussed above, Sampson has waived that issue by not briefing it on appeal. Thus, the only remaining issue as to GATX is whether Sampson can assert a claim against GATX under the FELA.

No. 12-30406

The district court found that Sampson failed to assert a claim under the FELA against GATX because GATX was not a "common carrier by railroad" under the terms of the statute. We agree. FELA tethers liability to a party qualifying as a "common carrier":

> Every *common carrier by railroad* . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in [interstate] commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51 (emphasis added). The Supreme Court, in turn, has defined a "common carrier by railroad" as "one who operates a railroad as a means of carrying for the public, – that is to say, a railroad company acting as a common carrier." *Edwards v. Pacific Fruit Exp. Co.*, 390 U.S. 538, 540 (1968) (inset quotation marks omitted). We similarly have defined a "common carrier" as "one who holds himself out to the public as engaged in the business of transportation of person or property from place to place for compensation, offering his services to the public generally . . . [and] undertakes to carry for all people indifferently, and hence is regarded in some respects as a public servant." *Lone Star Steel Co. v. McGee*, 380 F.2d 640, 643 (5th Cir. 1967). It is clear that GATX meets neither definition.

In *Edwards*, the Court held that the Pacific Fruit Express Company, which "owns, maintains, and leases refrigerator cars to railroads to transport perishable products in commerce," was not a common carrier under the FELA. *Edwards*, 390 U.S. at 539. In making that determination the Court held that "there exist a number of activities and facilities" such as the leasing and maintenance of railcars "which, while used in conjunction with railroads and

9

closely related to railroading, are yet not railroading itself." *Id.* at 540. In the Court's view, renting refrigerator cars to railroads did not qualify as business conducted by a common carrier. *Id.*

Sampson argues that the Supreme Court's analysis in *Edwards* was based on Pacific Fruit's specific function in the "niche industry" of providing "reefer" or "refrigerated" cars to railroads, and its holding is limited to defendants serving that particular function and does not encompass railcar companies that lease a variety of railcars. Sampson argues that GATX leases and maintains 132,000 rail cars, not simply "reefer cars." Sampson, however, provides no principled reasoning as to why the basic analysis of *Edwards* should not apply also to companies like GATX that lease railcars generally. *See Willard v. Fairfield Southern Co.*, 472 F.3d 817, 821 (11th Cir. 2006) (plaintiff did not "meet his burden of presenting affirmative evidence that [the defendant] is a common carrier" when the "evidence indicates that [the defendant] does not hold itself out to the public as providing rail service for hire"); *Greene v. Long Island R.R. Co.*, 280 F.3d 224, 235 (2d Cir. 2002) ("Companies that have no corporate affiliation or agency relationship with a railroad and merely supply the railroad with equipment such as refrigeration cars . . . are not 'carriers' within the meaning of FELA."); *Gaulden v. Southern Pacific Co.*, 174 F.2d 1022 (9th Cir. 1949) (affirming district court's determination that a freight car lessor was not a common carrier).

In *McGee,* we laid out four factors to consider when determining whether a company is a common carrier.[8] 380 F.2d at 647. The first and only factor we

---

[8] Those factors are (1) actual performance of rail service, (2) the service being performed is part of the total rail service contracted for by a member of the public, (3) the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, and hence such entity is deemed to be holding itself out to the public, and (4) remuneration for the services performed is received in some manner, such as a fixed charge from a railroad or by a percent of the profits from a railroad. *McGee*, 380 F.2d at 647.

No. 12-30406

need to consider in this case is whether there is "actual performance of rail service." *Id.* Sampson argues that GATX performs rail services because it "is engaged in the business of transportation, maintenance and repair of 132,000 railcars from place to place throughout the United States and beyond." However, Sampson has provided no evidence that GATX itself transports the railcars (as opposed to making the cars available for transport by railroad companies). Sampson's record citations do not indicate that GATX performs functions other than the maintenance, repair, and lease of railcars to railroads and other customers. A GATX witness testified that GATX leases cars to customers and the cars then "ride on other people's rails."

In the light of the Supreme Court's decision in *Edwards*, our test in *McGee*, and decisions of other courts declining to find that railcar companies are covered under the FELA, we hold that GATX is not a "common carrier by railroad" under the FELA, and the district court did not err in granting summary judgment to GATX for that reason. *See McCrea v. Harris County Houston Ship Channel Nav. Dist.*, 423 F.2d 605, 609 (5th Cir. 1970) (determination that defendant did not perform rail service under prong one of the *Lone Star* test foreclosed appellant's claim that defendant was a rail carrier under FELA). Thus, we affirm the judgment of the district court dismissing Sampson's claims against GATX.

V.

We now turn to address Sampson's claims against Honeywell and determine whether the district court erred in dismissing those claims. The initial question we ask is: which state law governs the scope of the duty that Honeywell may have owed Shannon Sampson. Before the district court, Sampson briefed the duty under Louisiana law. Now on appeal she argues, for the first time, that Illinois law applies because the Agreement (between

No. 12-30406

Honeywell and GATX) provides that it "shall be governed by and construed under the laws of the State of Illinois."

In determining which state's law applies in a diversity case, a federal district court applies conflicts of law principles of the forum state, here Louisiana. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Louisiana's choice-of-law rules, contracting parties generally have the freedom to choose which state's law will govern disputes arising out of the contract. *Cherokee Pump & Equip. Inc. v. Aurora Pump*, 38 F.3d 246, 250 (5th Cir. 1994); *see also* LA. CIV. CODE ANN. art. 3540. "Louisiana allows parties to stipulate in their contracts which state's laws are to govern them." *Technical Industries, Inc. v. Banks*, 419 F. Supp. 2d 903, 908 (W.D. La. 2006) (inset quotation marks omitted). Here, the parties chose Illinois law to govern the contract, and Sampson's alleged tort claim must spring from duties that contract imposed, if any. That would seem to end the matter as far as choice of law is concerned.

Except, however, for a problem Honeywell is quick to point out. As noted above, Sampson did not plead Illinois law in her complaint, nor did she raise it before the district court; she initially cited Louisiana law, and normally, that would mean that she waived her argument that Illinois law governs this appeal. *See Fruge v. Amerisure Mut. Ins. Co.*, 663 F.3d 743, 747 (5th Cir. 2011) (where a plaintiff "briefed only Louisiana law before the district court" and "never assert[ed] that [another state's] law should apply or that the district court should engage in a choice-of-law analysis," the choice-of-law argument was waived). If Louisiana and Illinois law reached different outcomes, the finding of waiver would be material to this appeal. Based on the narrow issue presented for our review, however, the choice between applying Illinois law and Louisiana law does not make a difference in the ultimate outcome because, as the parties

12

agree, the differences in the relevant law are nonconsequential.[9] Because we are a court of review, we review only the judgment and supporting arguments raised before the district court; thus, we will consider Sampson's claim against Honeywell under Louisiana law. *See Celanese Corp. v. Martin K. Eby Constr. Co.*, 620 F.3d 529, 531 (5th Cir. 2010) ("The general rule of this court is that arguments not raised before the district court are waived and will not be considered on appeal."); *see also Kucel v. Walter E. Heller & Co.*, 813 F.2d 67, 74 (5th Cir. 1987) (Plaintiff "does have an obligation to call the applicability of another state's law to the court's attention in time to be properly considered.").

We thus turn to whether the district court erred in granting Honeywell summary judgment under Louisiana law. After considering Sampson's somewhat legally confusing claim, the district court concluded that the specific nature of the allegation was tort: Honeywell, Sampson argues, breached a duty of care owed to the decedent under the railcar lease agreement. Upon evaluating the claim, the district court held that "It does not appear from a reading of the lease and the evidence presented that the provision about cleaning railcars was, in any way, intended to create a duty under tort law." Instead, "this contract created a contractual duty for Honeywell to return the cars clean so as to allocate the cost of cleaning the railcars to Honeywell and not GATX." Thus, because the contractual requirement that Honeywell return railcars to GATX "safe for human entry" was part of a general cost-of-cleaning scheme,[10] the district court reasoned that no tort duty sprung from the contract, and thus

---

[9] As we will see, both Illinois and Louisiana courts have endorsed § 324A of the Restatement (Second) of Torts, which is the basis for Sampson's cause of action. *See infra* n. 13.

[10] For example, the Agreement states that "[Honeywell] shall pay service charges for any car not promptly returned pursuant to the terms hereof or for any returned car if [Honeywell] has not caused the car to be cleaned of commodities." Further, it asserts that "GATX may provide cleaning services with respect to some or all of the cars" pursuant to a separate Car Cleaning Contract.

Honeywell could not have been negligent. Our main job today is to review *de novo* the legal basis of that holding.

On appeal, Sampson argues that the district court erred by ignoring language in the Agreement whereby Honeywell undertook two affirmative obligations: first, to return all cars to GATX "cleaned of commodities," which is defined to mean "safe for human entry," and, second, to indemnify and hold harmless GATX from and against all claims for personal injury or death that GATX may incur from Honeywell's failure to comply with the contractual terms. Thus, according to Sampson's brief, the district court ignored the plain terms of the contract under which "Honeywell agreed that it would make the car safe for human entry and that if it failed to do so, it would be solely responsible for any damage caused by its failure to do so." In Sampson's view, the district court erred by essentially holding the requirement that Honeywell return the car clean and "safe for human entry" to be mere surplusage.

Sampson further argues in her brief before us that her husband, an employee of GATX, was a third-party beneficiary of the Agreement and thus may assert rights based on breaches of it. But her arguments before the district court were based in the tort of negligence,[11] not in contract; so Sampson has waived the third-party beneficiary argument. *Celanese Corp.*, 620 F.3d at 531. That does not mean, however, that her claim against Honeywell collapses. Although we may not consider her third-party beneficiary argument, her tort claim – although inartfully pled and, at times, hard to decipher – has been sufficiently

---

[11] For example, in her petition for damages, Sampson said that her husband's death was "proximately and legally caused by the fault and negligent acts and omissions of . . . Honeywell . . . including . . . [t]he breach of [a] *legally imposed duty of care* . . . ." (emphasis added). In her opposition to Honeywell's motion for summary judgment, Sampson noted that the starting point for her *tort* liability claim comes from LA. CIV. CODE ART. 2315 and argued that "By agreeing to the[] contractual provisions [in the Agreement] Honeywell undertook a *heightened duty* designed to protect against the very injury and damage herein sued upon." (emphasis added).

preserved.[12]   Therefore, we consider only whether, under Louisiana law, the Agreement gave rise to a tort duty owed to a third party like Shannon Sampson or whether, as the district court held, the requirement that Honeywell return the car "cleaned of commodities" and "safe for human entry" merely concerned cost allocation.

Sampson cites Section 324A of the Restatement (Second) of Torts as the basis for finding such a duty.[13]  Section 324A represents a common law doctrine that "has existed for centuries and has traditionally been used to impose liability upon an actor who has failed to exercise reasonable care when it undertook to perform a duty owed to a third party."[14]  *Bujol*, 922 So. 2d at 1128.  This so-called

[12] It is true that Sampson has difficulty in precisely categorizing her claims: before the district court, she made a variety of allegations, some of which sounded in tort, and, before us, her third-party beneficiary argument, though mislabeled, uses tort liability language. Therefore, while her categorization has been confusing, the basis of liability in tort has been consistent.  Admittedly, however, our considerable labor in deciphering the true nature of Sampson's claim lie somewhat in tension with the idea that a court should not have to make a litigant's argument for her.  Nonetheless, we have concluded that, given Sampson's repeated allegations of tort liability, *see supra* n.11, she has come "close enough" to stating a plausible claim that we may consider it to be one based in tort under Louisiana law.

[13] In so doing, however, she presents her claim rather inartfully.  Sampson cites *Illinois* (rather than Louisiana) case law applying REST. 2D TORTS § 324A, *Pippin v. Chicago Housing Authority*, 78 Ill. 2d 204, 210 (Ill. 1979).  Nevertheless, such case law overlaps with Louisiana precedent, which has applied the same provision to suits originating in Louisiana.  *See, e.g.*, *Bujol v. Entergy Servs., Inc.*, 922 So. 2d 1113, 1128 (La. 2004).  For the reasons stated above, we apply Louisiana law to Sampson's case.  *Cf. Graham v. Milky Way Barge, Inc.*, 923 F.2d 1100, 1109 (5th Cir. 1991) (applying §324A to a diversity case under Louisiana law).

[14] Section 324A states:
> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>> (a) his failure to exercise reasonable care increases the risk of such harm, or
>> (b) he has undertaken to perform a duty owed by the other to the third person, or
>> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

15

"voluntary assumption" doctrine suggests that, once a party voluntarily renders services to another, it may not unnecessarily increase the risk of harm. *See In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 838 F. Supp. 2d 497, 513 (E.D. La. 2012). To recover under Section 324A under Louisiana law, a plaintiff must prove that

> the defendant (1) undertakes to render services, (2) to another, (3) which the defendant should recognize as necessary for the protection of a third person. Even if a plaintiff proves the assumption of a duty under that standard and that the defendant failed to exercise reasonable care to perform this undertaking, he can only recover if he further proves that either (a) the defendant's failure to exercise reasonable care increased the risk of such harm; or (b) the defendant has undertaken to perform a duty owed by the employer to the injured employee; or (c) harm is suffered because of reliance of the employer or the injured employee upon the undertaking.

*Bujol*, 922 So. 2d at 1129-30.

Here, Sampson has offered evidence under each of the necessary factors and has made a *prima facie* showing under § 324A sufficient to survive summary judgment. First, Honeywell, through a contract, "undertook to provide" to GATX the service of cleaning the car to the standard of "safe for human entry." Honeywell knew or should have recognized that cleaning the car until it was safe for human entry was necessary for the protection of persons, who, like Shannon Sampson, were employees charged with entering and inspecting the car once it had been returned.[15] Second, Sampson has offered sufficient evidence to create a dispute of material fact that Honeywell was negligent ("failed to exercise

---

REST. 2D TORTS § 324A (2012).

[15] There is at least a genuine issue of material fact whether Honeywell "should have known" that its cleaning service was necessary for the protection of third parties because the Agreement's plain terms equate human safety with Honeywell's performance under the contract, and the Agreement contemplates that Honeywell would indemnify GATX for personal injury or death claims.

reasonable care") by transmitting GATX 25031 with a cleaning certificate even though the car was not safe for human entry.[16]   Third, Sampson has put forth additional evidence that Honeywell's negligence was the proximate cause of the injury,[17] essentially arguing that Honeywell "increased the risk of harm." *Bujol*, 922 So. 2d at 1137.  "Some physical change to the environment" is sufficient to prove an increased risk of harm.  *Id.* at 1135 (quoting *Patentas v. United States*, 687 F.2d 707, 717 (3d Cir. 1982)).  Here, there is some evidence that Honeywell's application of a nitrogen pad to the railcar altered the physical environment of the car.[18]   That alteration may not have been the *only* cause of Shannon Sampson's death because there is substantial evidence that his failure to follow proper safety procedures also played a role in the accident;[19] Shannon Sampson's agency in the causation of his death is a matter for determination at trial.  But Sampson has put forth enough evidence on this last factor to survive summary judgment.

---

[16] Although Honeywell presented evidence that cars were considered "clean" even though a nitrogen pad may have been applied during the cleaning process, other witnesses testified that whether or not a nitrogen pad was applied was relevant information to be included on a cleaning certificate and that, when nitrogen pads are used, oxygen is displaced from the railcar chamber, making the environment hazardous. On cleaning certificates, it now indicates whether or not nitrogen was used in cleaning.  The conflicting testimony is enough to raise a genuine issue regarding negligence in relation to the cleaning certificate.

[17]  A plaintiff can establish proximate cause by showing that one of the three subsections of § 324A applies. *Johnson v. Abbe Engineering Co.*, 749 F.2d 1131, 1133 (5th Cir. 1984); *see also Bujol*, 922 So. 2d at 1130 n.18.  The three subsections are (1) defendant's failure to exercise reasonable care increased the risk of harm, or (2) defendant undertook to perform a duty owed by the employer to the employee, or (3) the plaintiff's harm was a result of reliance by the employer or the injured employee upon the undertaking.  *Johnson*, 749 F.2d at 1133.  At issue here is subsection (1).

[18] For example, Clifton Kirby testified that the low level of oxygen in the car was unusual and that "In the two and a half years that I was [at GATX's Minden facility], I do not remember any car setting off our monitors" as GATX 25031 did when its oxygen levels were tested after the accident involving Shannon Sampson.

[19] The matter of comparative fault is not a matter before us in this appeal.

No. 12-30406

Thus, the district court erred because its characterization of the relevant terms of the Agreement as cost allocation provisions ignores their clear language, which establishes a duty that Honeywell may have negligently breached by returning GATX 25031 unsafe for human entry and failing to note that a nitrogen pad had been used on the cleaning certificate.

In sum, we hold that Sampson has made a *prima facie* case under § 324A to support an allegation against Honeywell of negligence in applying a nitrogen pad and returning the car without marking the potential hazard on the cleaning certificate, an action which sufficient evidence shows altered the physical environment inside the car, which Honeywell had an obligation to make safe for human life, and such alleged negligence may have increased the risk of Shannon Sampson's death.

## VI.

For the above reasons, we affirm the district court's summary judgment on behalf of GATX.  Dismissal of Sampson's claims against GATX was appropriate because GATX is not a "common carrier" under the FELA.  However, we further hold that the district court erred in granting summary judgment on behalf of GATX's co-defendant Honeywell because there remains a genuine issue of material fact whether Honeywell was negligent under Restatement (Second) of Torts § 324A.  On remand, the court will determine whether the tort duty established by the Agreement was breached by Honeywell and whether that breach was a cause of Shannon Sampson's death.

The judgment of the district court regarding Clifton Kirby and GATX is therefore affirmed; the judgment regarding Honeywell is reversed; and the case is remanded for further proceedings not inconsistent with this opinion.

AFFIRMED in part;

REVERSED in part; and REMANDED.

18